Thank you. Good morning and welcome to the Ninth Circuit, although most of you probably live here. It's a delight to be here in San Francisco, and it's a pleasure to be sitting with Judge Gould, who joins us via the television here, via video. Judge Gould, can you hear me? Yes, good morning, Judge McGeough. And good morning, Judge Feinerman. Good morning. Good morning, courtroom. Before we begin, I would like to, on behalf of Judge Gould and I, to thank Judge Feinerman, who is sitting with us by designation and assisting us with he's here from the Northern District of Illinois, and we're just very grateful for all of your assistance this weekend, including today, Judge Feinerman. Thank you. It was a privilege to be invited to sit on the Ninth Circuit, and a particular pleasure to be able to sit on the same panel as Judges Gould and McGeough. So I think this is the only case, the case of United States of America v. Damien Slew, is the only case on the docket today. So if the attorneys are ready, we can come forward and we can begin. Good morning, Your Honors. Good morning, Judge Gould. My name is Ethan Ballo. This morning I speak for Damien Slew. I'm going to watch my clock. I'm going to do my best to save three. Maybe it'll be less. I'm going to start with the lesser-included offenses. I do want to argue the Sergeant Turner linguist issue, and I hope to get to the Pinkerton error with respect to the insufficient mens rea and why it should not have applied to counts three to five. Regarding the lesser-included offenses, the standard is, and it's undisputed, it's set forth by this Court, it aren't, if there is some evidence to support the jury instruction, it is the jury's province to determine which evidence is to believe most accurately reflected the events surrounding, in that case it was the stabbing, here would be the shooting. And Art explains at the end of its opinion why this is, that when there is a dead body, jurors might be loath to choose between all and none, either murder or acquittal. And as we know, whenever there is a passing of a human life, there's an incredibly broad spectrum of how that came to be, whether it's reckless, all the way to homicide. There's defenses like self-defense, and there's imperfect defense that lead to landslaughter. And that's what we want to talk about here. So I'm going to focus on voluntary manslaughter. And the district judge made an express finding, first in the original run-up at the Rule 30 conference, Judge Gonzales-Rogers said because Slew in his testimony denied pulling the trigger, he was not entitled to an instruction, which is the definition of abuse of discretion, because whether he testified to that or not, or whether he shot him or not, would not be legally dispositive as to his ability to get the instruction. Ultimately, she says, in her finding on the record, there are absolutely no facts, her quote is, no facts to support the instruction, which is why she withheld it. And we disagree, and I want to identify the facts by which a rational juror could have found that this was voluntary manslaughter. In fact, this case jumps out as a manslaughter case, as a drug deal gone bad, not a premeditated attack. And the facts would be, one, as the government admits, the shooting happened in response by being punished by Muzak. On page six of the answering brief, the government candidly tells us the testimony from its star cooperator, Boyd, was as follows, and I'll quote, they had an argument over the quality. Muzak had tried to hit him in the mouth, and Slew had pulled out a gun and shot Muzak in the arm. He had then taken the money and the marijuana and pushed Muzak out of the car. Even the government's harshest spin supports what Boyd actually said, that first, Muzak, the victim, attempted to hit him. There was an altercation. Then, again, Mr. Slew, he did punch him in the mouth, and that's when the shooting occurred. Second, we know it's a small, confined space. Third, we know from Boyd that Muzak is extraordinarily strong. He's a man so strong, he can carry a couch by himself. We know he shot in the arm, and we know that from the 5K letter, that the description that Boyd gave of being shot in the arm was accurate and truthful, according to the United States of America, and supported the three-year sentence. We know that Slew did not believe it was fatal, because he said he should be all right, and Judge McGee, especially, credited that testimony. He stated he had no intent to kill. This is for the record, because Judge McGee wasn't at that. Oh, I apologize. I apologize for that, Your Honor, and I accept the correction. I just don't want the record to think that I'm sitting on a case that I... No, and it'll hopefully be my last error of the day, but perhaps not given my track record, but I won't make that error again. I apologize, Your Honor. Judge Gonzales-Rogers credited that finding, and it's just on the record. That's Boyd's testimony. So we have that testimony established as reckless and not intentional, which supports a voluntary manslaughter instruction. Adding to this complex of facts, I think it's important is... Counsel. Yes, Your Honor. I can interject a question for you. Yes, please, Your Honor. My question is, if the appellant pulled out a gun and shot the guy dealing the drugs, why would that be manslaughter, as opposed to a second-degree murder in Passion, because he's hit by the other guy? Okay, I'm going to answer that in two ways. First of all, thank you for bringing up Heat of Passion. We withdraw Heat of Passion. This is not a Heat of Passion case, and it was an error for us to suggest it was. Heat of Passion is actually just the anglicized version of inflagrante delicto, where we find it's manslaughter or lesser culpability if you found a spouse or a paramour engaged in sexual congress or in a romantic situation that inspires ire. We say if you overreact, either by killing the paramour or your spouse or partner, that that's not murder. It's manslaughter, and it's almost medieval. This is a sudden quarrel case, which is different than Heat of Passion, but I'll answer your question in that context. And you say, why wouldn't it be secondary murder or something else? And that's a great question. The answer is, I don't know. That's why you get the jury instructions, because it's a fact-finding on what's the mens rea. So for voluntary manslaughter in this case, if you're in a tight confined case and you get attacked and you overreact, if you overreact recklessly with extreme indifference, that would support a finding of manslaughter because you didn't intend to kill him, but you were reckless with extreme regard for human life and there was a death involved. If you were brandishing the gun and waving it, it was accidental, that would support involuntary manslaughter. Secondary murder also has intent to kill. You have to want to kill him. So it would depend on what the jury found and what the district judge would be required to do is instruct on each of them and let the jury make that finding, which is what Arndt and Anderson and Crow say. And I really want to recommend to this court, the United States v. Crow opinion. It's by Judge Piaz. Out of all the opinions, and that was cited by the government first in their answering brief, out of all the opinions, and this is definitely a detailed, complex area of law, it does the best job I have seen of laying out the different levels of culpability of homicide and the facts that would or would not support such a finding. The last thing I'm going to say on this before I pivot as my clock rolls is, I'll actually answer all questions, Your Honor, is I think the government assisted the district court to its error because they told Judge Gonzales-Rogers that the defense could not argue in the alternative. And she agreed and she barred them. So the government could say the shooting was intentional, even though Boyd didn't say that. He didn't say one way or the other whether he intentionally shot him or accidentally shot him. We know he thought it wasn't fatal. The government was permitted to argue intentional shooting, but she barred the defense from even arguing accidental or reckless. And that's a terrible ruling. It's also an error. You can argue in the alternative. This court in Matthew says you can argue you didn't do it or you were entrapped. The Supreme Court in Stevenson, I think in 1896, says you can say you acted in self-defense, but if not, it was manslaughter. So defendants are allowed to argue in the alternative, and by the government, by telling Judge Gonzales-Rogers and her adopting that incorrect formulation, prejudice to defense. Yes, Your Honor. I'd like for you to get to the translation before your time goes. That's where I was going to pivot to, unless you had questions about that. Sergeant Detective Turner should not have testified as he did. Well, should he have testified at all? No. He should not have. It's extraordinary. There was no objection. He was submitted by the That's true, but at the critical point in time, when he starts translating, he should have been allowed to testify to patois translations. So you agree with that? That's absolutely appropriate. You need a translator. The jury does specialized knowledge of a foreign language that a jury, whether it's patois or English or French or Creole, absolutely appropriate. The first time he started giving meanings of English to English, defense counsel objected. And as this court knows, and Freeman might be the best workup, we have a district court on here. I'm glad we do that. This is core function. We have a former district court judge, if I'm right, Judge McGee. Yeah, and district court judges rely on objections. And if it's going to be a standing objection after the record shows that that has been repeated, then you look at that. In this case, there was one objection early on regarding one aspect of the testimony where Mr. Turner was translating and the defense counsel stood up and said, oh, this is going beyond the scope. He's offering opinion. And then there was a question about laying foundation. I think it was at that point. And then there was no other objection. And despite the fact that from time to time, the translation that was being given by Mr. Turner was, and this is unique because it's a Jamaican patois, there was English that was discernible, arguably, and then there was the language that was not discernible that Mr. Turner was to assist. And one example of that was when he was translating the comments between Mr. Slew and his girlfriend, Ms. Davis, I believe. Ms. Lee. Ms. Lee, I'm and don't write letters. And he, the transcript from what Mr. Slew said is you can't write anything too serious in the letters. And then the question was when Mr. Turner was asked to interpret, did you have an understanding of what that means, what that meant? And he answered from what it sounded like to me was he was hoping that she would write him some explaining to her, don't write anything too serious in the letters because the jail guards, they read them and they read the letters. Now that was arguably not a direct translation of what was said. There was no objection made by the defense counsel. And yet you're saying the district court here should have been making some sort of realization here and doing something without an objection. This is how the testimony was coming in. I agree with that. Can I correspond? Then you get to this point and then there was no objection. So I guess I'd like to hear what. I'll take it in three parts. One, I understand district courts rely on objections. They also follow this circuit's rules and this circuit said in Freeman, and I can give you 20 cases if you like, district courts must be vigilant gatekeepers on expert testimony. It's a heightened moment at trial. They have special powers. They get instructions to jurors. They can give opinion testimony. It's a critical point in time. Two, he made the right objection at the right time. English to English interpretation is improper. There was one answer that there was one response that from a district judge that would have been proper sustained counselor. She didn't say that. She said lay foundation. And if the United States of America can come up here and tell me the proper foundation that was laid or could have been laid to admit Sergeant Turner to give English to English interpretations, I will listen to that proper foundation. But if the answer is there was no other objection, he made a perfect objection. It was not sustained. And there was the basis of laymore foundation is nonsensical in the legal world. What foundation could they have laid? There was no objection at the time when this the the the word robbery came out. Do you agree with that? I agree with that. But my point is, if there was no objection at that time, it's plainly erroneous. So we're looking at this under plain error. I think it's abuse of discretion because when Judge Gonzalez Rogers didn't sustain the first objection and suggested that additional foundation could permit this testimony, she was clearly wrong as a matter of law. There was no foundation on planet Earth that permitted this line of question. But there wasn't a follow up objection after that. Right. But if she sustained the first objection, there would have been no need to. She permitted it to go forward by not sustaining a proper objection. But the problem with the first objection was the English to English. And then there was another problem, a separate and independent problem later on, which was Turner saying that they were talking about a robbery. That's not an English to English problem. That's a patois to English problem. So even if it had been a standing objection on English to English, it wouldn't carry forward into the robbery, conjuring the robbery, conjuring the robbery, I think is plain error. She was definitely alerted. This was problematic. But even under plain error, she now she knows she's supposed to have heightened vigilance. This is coming in and it's terrible testimony with no basis. In fact, let me. And so I'm playing a review. It was prejudicial. There is no robbery except for the Sergeant Turner. Boy doesn't give him a robbery. He didn't plan a robbery. He didn't participate in a robbery. She doesn't give him a robbery. There is no robbery except the one conjured by a detective saying he's pulling it from his ideas because his mother spoke patois in Jamaica to hide her saying things in Jamaican to other people. It doesn't make any sense. But I'm burning. I have a minute. So I do want to get one minute of Pinkerton Pinkerton. I have another question. Oh, take as many as you like. You're on my clock. Yes, I do. You had the ability to cross examine the expert regarding that robbery. Well, I counted it. Well, OK. Do you agree with that? Of course. And did they know? OK, I don't think that's meaningful, though. Why not? Because whether or not he tried to take apart that testimony doesn't answer the question of whether it was probably presented to the jury in the first place. That error had been made. And if that error was prejudicial and affected the fact finding process, it supports reversal. And if that error was either not error or was not prejudicial, then our claim won't be sustained. But whether or not the defense attorney took additional action later on to ameliorate a potential problem or sought or understood how to deal with it does not change the claim at bar, which is the admission of that testimony was improper and it was prejudicial and it caused this jury to go astray. My next question is, is you had an opportunity to direct examine your client or sorry, trial counsel had opportunity to direct examine Mr. Slew. Mr. Slew testified, yes. Right. And to elicit exactly what he thought at what occurred during the. Yes, there was a direct examination, cross-examination of Damien Slew at the trial. And so does the jury not get to assess the credibility of your client at that point? Of course. All right. And doesn't that factor? Because if we are looking under plain error review, then we have to see if there was error. Assuming there is error, then maybe the robbery shouldn't have come out. Then we have to examine whether the substantial rights of your client were affected. And I guess, give me why they were affected here. Because it has to have changed the outcome. Right. There has to be a reasonable probability that one juror would have come to a different verdict on the Cone v. Bell had this error not been made. And here, the government has a star witness named Shondell Boyd. He's cooperating. His buddy, he brings the whole deal. Right. He is the connection to the buyer. He's connection to the seller. He's connection to the watchman driver, Q, which is odd that we never find Q. In my experience, the government can, they had a cell phone. They had his car. They have a cooperator says he hangs out in a corner. How do we not know his real name at this time with the United States being his supporter? I don't understand it, but put that aside. None of them say it's a robbery. It's a drug deal gone bad. They're not planning to rob Peter Muszak. They're planning to make a deal with him in a car for $30,000 worth of marijuana. I will accept that the jury might have thrown away Slew's in this case to make felony murder, which is really, they did a felony murder in Pinkerton. They're arguing that it was a robbery and he shot him to steal it. And it was intentional. That's their case. And the facts as testified by Boyd seem very different. Boyd is saying they're trying to make a deal. It goes bad. Even on the recording, and I think you got this on ER, what's it, ER 498. That's what Slew says on the phone. It just went bad. It's a drug deal gone bad. And it looks like that. And all the independent evidence does, the only solitary piece of evidence that says robbery, is conjured by a police sergeant where nothing in the transcript says robbery. But did you say a police sergeant? He wasn't testifying as a police sergeant. The jury was made informed that he was a police detective and he testified. But his main thing was the translation, I thought. Right, but a police detective. And that was known to the jury. It wasn't like the jury didn't know. It's not like I'm bringing out an outside fact. No, I know that. So the jury understood a police detective came in and said, I'm an expert. The judge has ordered you to accept my translation. I'm an expert on linguistics. And I interpret this conversation as he was doing a robbery. And he planned a robbery. It's conjured. Again, I asked the government to come back with a, what kind of foundation would have supported this errant testimony? Show me where it says robbery and he's translating it. And if we look at his translation, right, we have the translation. It doesn't say robbery anywhere. On the stand, live, they say something like, so what did that other part sound like to you? Unspecific, a sprung load witness, and he comes up with, oh, they're planning a robbery. Talk about hitting pay dirt. That was planned improper testimony outside the scope of anyone's expertise and not supported by the transcript. And we know it because he never translates the word robbery anywhere. If he was translating robbery, then it would be in the transcript, right? Oh, he said, me do, I can't do that, uh, good, uh, good, uh, sorry. That's why. And that means we did a robbery. Now that would have been permissible testimony and you could get a counter expert. You could have him say, that's not what that means. He's misinterpreting. We can slow down that tape. We can understand why is this man saying robbery? Well, this is what he said. It just went bad because didn't want to give it. Fight him back. You know how it is. You know, give me that. With a bunch of ellipses. People feel brave. You feel you really aren't going to, you see what I'm saying? So I'm just trying to figure out how is that different from, hey, don't say anything serious, uh, too serious in the letters because of the jail guards and, and then the additional of they read the letters. I mean, how much interpretation, uh, do we allow for the patois when we know that, uh, language, especially when there's slang terms and we have a case, I think it's Ferdinand Garcia that says we give some, um, latitude, I guess, the way I'm, I'm, I'm interpreting that way. And so this is a very, you know, important point here. And so I'm just trying to figure out how much of this is just interpretation. None of it is, none of it's, this is, he wasn't interpreted to interpret at all. It's translation and that no more. There's no one. And let me, I'm going to step back. Let me just give you an example. I was a trial court judge in Arizona and we had Navajo interpreters all the time. They couldn't do a literal interpretation or translation. They had to give the, uh, translation with respect to the concepts and to how that language is spoken and then break it down in the best way possible for the English language. I understand this is a little bit different. I'm just trying to figure out how much different because you have this unique language, um, issue in that this is Jamaican Patois, which also has some parts of it are English and then some parts of it goes into some sort of syllable sounding and short words that, uh, have an interpretation. Let me answer it in two ways, Your Honor. One, it's completely different. We know that doesn't apply here because the government proved it. They gave us the written translation that provides the translation. This is what the jury was entitled to, to listen to the tape while reading along. That's what they were entitled to. They couldn't even get this to go to the jury box with them. They had to listen and read along. Those are the rules of this circuit. And the government said in real time to the United States District Court, we have the ability to translate it. Here's our official translation. Full stop. It's over. There is no need to interpret. Second, and I don't, I think the court buys into what's really, I don't think a very good argument. Uh, when you, the jails tell the inmates and you've upheld the introduction of jail calls, we record your calls, tell the people you talk to record your calls. When we give a Fourth Amendment condition, we tell people you're, you have a Fourth Amendment condition, tell people in your residence you're subject to search, the house is subject to search. We have this entire body of law that says warn others when they're subject to this privacy invasion that we respect and expect people to make. So when Damien Slew tells his girlfriend what we expect and he's been told to do, hey, these are recorded lines or they read all my letters, he's saying what he's supposed to say. There's nothing nefarious about it. In the least, lawyers talk to their clients. If it's not an attorney client call, they say, hey, I'm going to come visit you. I don't want to, we don't talk on the phone. They're recording our phone call. It's okay for the defense attorney not to object at that point. Is that what you're saying? No, I think it's, I think the point that whether, there's no basis for interpretation at all of English to English and it's plainly, once he objects, whether he should have objected later or not, and we can disagree, you win the argument, I'm saying ultimately it doesn't matter because the robbery evidence and his interpretation evidence is so far beyond the pale that a vigilant district court judge, having been alerted that a police detective is about to go off the rails and she thinks further, and she says, when she says lay further foundation, she says something interesting. But I don't know what kind of foundation you are talking about. Judge Gonzales-Rogers recognizes this is bad testimony and she should have stopped it. She should have said full stop. Damali Taylor, the prosecutor, says can we approach sidebar? Judge Gonzales-Rogers says no. And there was a right answer there, which was you can't do this. This is not, you have the, he's allowed to give the interpretation, no more, no less. That's what he was, that was the scope of his expertise. That's what was disclosed. That was what was proper. And all of this interpret what he's saying is incorrect. But I was, I'm sorry, I'm off track. When you asked me how did it prejudice him, there was no robbery until a police officer said there was a robbery. All the other facts of this case look like a drug deal gone bad. If it's a drug deal that's gone bad, it's a manslaughter case. It's not an intentional case. So that's why I wanted to pivot to the Pinkerton because it also relates to... I've gone way over my shirt here. I'm very well aware of the Court's generosity. I'll make a point, I'll let the government argue, and of course you can make me sit down whenever you like, Your Honor. On the Pinkerton, there's two major problems. And I think it's best exemplified... Well, I mean, you can give me a summary statement on the Pinkerton and... Take a look, take a look at the SCR. It's the government's excerpts at 845 and 846, which is the government's summation. They argued, and were permitted to argue, that if Slew agreed to a drug deal and anyone killed Muzak, that's felony murder. And that's not right as a matter of law. Drug dealing is not an inherently violent felony, so it doesn't qualify felony murder if they believe drug deal gone wrong. And even if they wanted to believe robbery under Pinkerton, putting aside that it wasn't part, an object of the conspiracy, so it wasn't pled that way, you would still need to instruct the jury that the defendant had the specific mens rea of the inherently dangerous felony, which supports felony murder. So they would have to make a finding that he intended to rob him, and he died in the course of the robbery. And none of that was done. So here, on this record, it is clear that Damien Slew may be doing life in prison because there was a drug deal and Muzak died, and there was no finding of any mens rea to rob him, any mens rea to kill him, any mens rea to kill him. That's extraordinary. That's beyond the pale. Thank you. Thank you, Your Honor. I'll sit down now. Okay. Thank you. Now, I gave counsel for Mr. Slew a lot of extra time. I think we don't have any other cases here this morning, and this is a really interesting case and presents a lot of difficult, I think, questions, and so I'll allow you extra time as well if you'd like. Thank you, Your Honor. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. This Court should affirm all of Damien Slew's convictions because to the extent that he did not waive the claims presented today, those are meritless. I'd like to start off by talking about why the District Court was correct and did not abuse its discretion in declining to give the manslaughter instructions. To begin with, I think that the record shows that Slew, the defense, waived their claim to voluntary manslaughter. Now, defense counsel just came up and said, we're withdrawing our claim on heat of passion, but if you look at the record, on excerpts of record of 47, not only did defense counsel withdraw that at trial, but he also withdrew the imperfect defense theory. He said, granted, that does not seem to be case, either for the heat of passion aspect on the top or the honest but unreasonable belief at the bottom part. So he has withdrawn very specifically and waived that claim in District Court. Again, that's on excerpts of record 47. That, I think, is... What about the sudden quarrel? The sudden quarrel... Was that withdrawn at trial? I think that the sudden quarrel is the heat of passion part of it. So he's withdrawn both of those, and that's the entirety of the voluntary manslaughter part of the instruction. What the defense counsel at trial did was to say, essentially, okay, we withdraw after listening to all the evidence, both the voluntary manslaughter, but we are seeking involuntary manslaughter. So we're not saying or contending that defense counsel waived the involuntary manslaughter request. But there was no basis, no evidentiary basis for giving this instruction, and the District Court... The involuntary manslaughter. Involuntary, or voluntary. I'm just saying that on the voluntary, there was no evidentiary basis, and defense counsel actually agreed and waived it. So I think the focus should really be on the involuntary manslaughter instruction, which they did request. And there... I'm sorry. So you're saying... Because counsel made a distinction between heat of passion and sudden quarrel. Is it your position that those two things are the same? Yes. I think that the sudden quarrel idea was that there was... Well, sudden quarrel can go to either, I suppose. If there was a sudden quarrel and it overcame the defendant's ability to really kind of control himself, that would, I think, amount to a heat of passion if it was reasonable, for a reasonable person. If the sudden quarrel caused him to think that he needed to kill the defendant, the victim, excuse me, in order to preserve his own livelihood and prevent serious bodily injury, that would go to the imperfect self-defense. So the idea that there was a sudden quarrel, I think, could go to either way of making the voluntary manslaughter argument, both of which were waived. And I think that there is no evidentiary basis for any of the manslaughter instructions. As Defense Counsel Godovan said, really the only bases are two, and they both stem from Boyd's testimony. The first one is Boyd's testimony that what Slough said in confessing to killing Muzak was that Muzak had first tried to or actually had hit him in the mouth. And second, the next day when Boyd said that he believed that Slough was actually trying to threaten him by saying, you're lucky I didn't shoot him here in the forehead or shoot him here in the chest, he should be all right, that that meant that Slough thought that he hadn't actually killed Muzak. Now, those two pieces of evidence are not enough for a rational jury to find that there was gross negligence on the involuntary manslaughter side of things. Involuntary manslaughter is a low mens rea. It's a situation where there is no malice. There was an accident. There was no intent to kill. And it has to be reasonable for a person to think that they are employing force that would be non-deadly, but somehow negligently caused a death. And in this case, what the evidence showed and what Boyd's testimony actually was, the full said that he pointed the gun and shot Muzak while Muzak had his arm raised and said, no, wait. So while Muzak, that is, was pleading for his life, he took a gun, and the pathology reports show this, and put the gun towards the man's torso while the two were sitting side by side in the front seat of a car, front of a car, put that gun towards the torso and shot it within an inch of the person's arm where the person, Muzak, was holding his arm to protect his torso. This is not a situation where you have evidence that he is shooting at some person's extremity where it was maybe unrelated to his torso. We're talking about close confines, close quarters of a car. Using a gun, that's lethal deadly force. And no one might not kill somebody or have a high likelihood of doing so. So for those reasons, the district court did not abuse its discretion in finding there was no evidence of gross negligence. And Mr. Bala, is it Bala? Bala is asking us to look at the Crow opinion in our decision in Matthew. Is there anything in there that you want to highlight that would support what you're saying? I do. I do want to say that in the Crow decision, the court said very clearly that the involuntary manslaughter instruction was consistent with the evidence. That is, the evidence would allow for that. In the Crow opinion, in the Crow case, you had a woman who had swung a knife during an altercation with her romantic partner. And then the person ran off and then came back and it turned out that she had actually dealt a lethal blow. Her defense at trial was self-defense. But she didn't say in her testimony that she had intended to kill him. She said that she had intentionally struck the blow because she was trying to protect herself, not that she intended to kill him. And so the district court in that case found that the intentional striking of a blow with a knife was not necessarily the case. And could find that that would be consistent with both self-defense, the intentional striking of the blow, and also involuntary manslaughter where there was the use of non-deadly force or what you believe to be non-deadly force that accidentally caused the death. That, I think, is consistent with the government's position here, which is you have to look at what the evidence supports. And that the district court gets to evaluate whether that evidence supports the instruction and that a rational jury could make such a finding. In this case, we have a very different situation. We don't have a situation where somebody is in, you know, a pregnant woman is trying to fight off her husband and takes the knife to kind of, you know, prevent more harm. What we have is a drug deal. We have a situation where there are two people in a car and the person potentially maybe is trying to fight off. And then say, you know, maybe there's a quarrel over the quality of the marijuana. And then the perpetrator, the killer, takes out a gun and point blank, within an inch of the victim's arm, shoots him, causing the burning and the blackening and the hardening of the gun wound as it goes from the arm, through the armpit, through the lung, through the, you know, aorta, and lodges within the body of the victim. This is not a situation of gross negligence. And the district court did not abuse discretion in finding that there was no evidence on which a rational jury could reasonably conclude that this was gross negligence. Even if they take into account Mr. Slew's testimony that it was Slim? Slim, yes. Q or Slim. Q or Slim that shot Mr. Muszak and how he described that happened. That's not a basis for involuntary. No. Well, so I will say first that Slew's testimony was that Slim had done the shooting. And I think the evidence at trial showed very conclusively that that was, it was not consistent with the pathologist's report. Because the idea was that he had taken it out and using his left arm, had shot basically at the waist level instead of up towards the arm. But even if you were to say that it was Slim who had done the shooting, we're still talking about taking a gun in close, close quarters and shooting somebody at their body. This isn't sort of in some open space where you have a hunting, you know, party and then maybe a gun goes off or somebody's shooting a warning shot. This is an intentional shot. And in fact, Slew's version of things is in some ways, you know, more damning. Because according to Slew, Slim and Muszak were having a quarrel about quantity. And Muszak never tried to hit him or do anything like that. And suddenly Slim took out the gun and shot him. So there is no version, in Slew's version, there is no recounting, excuse me, Slim's trial testimony that is, does not include any account of Muszak trying to hit Slim. Slew's account to Boyd, which was recounted in Boyd's trial testimony, includes some reference to potentially Muszak trying to hit him. But again, this is also a person, the testimony was that Muszak was a five foot nine, 160 pound person sitting in the car. Even if he had hit him, the testimony was that before the shooting, he had basically raised up his arms and said, you know, please, no, don't, like stop, let's not do this. He had basically raised any white flag to the extent that there was a quarrel. And so the idea that somehow that would be adequate provocation for voluntary manslaughter or that the shooting itself was accidental or negligent, there's no basis for that. And the idea that somehow, because there was a gun, it might have just been brandished and it went off accidentally, that's based purely on speculation. There's no actual evidence to support that. Slew never said, whether at trial or to Boyd, oh, I took out a gun to threaten Muszak and accidentally it went off. So this, this is all kind of constructed in the appellate stage, I think, you know, without real basis in the evidence. So let's talk about the translation, at least I'd like to, and get your response to some of the discussion that was occurring with your colleague across the aisle. I guess I have a couple of questions and for you regarding this. And did you need to charge robbery? What was your evidence of robbery? What was the government's evidence of robbery and the basis for the indictment? Well, the evidence for the robbery was that you had Slew basically setting up a situation where he was the only person in a car with marijuana, that he then, part of the translation indicates, and you don't even need the interpretation, but the translation indicates that he says, well, you know, people feel brave and they try to sort of fight, indicating that he was trying to maybe take that marijuana without paying for it. That the marijuana, after the shooting, Mr. Slew took off with four bags of marijuana and all of the cash. He didn't try to give back the marijuana. He didn't try to pay the cash. He took that and then he went and proceeded as though everything was fine. He didn't really say anything about the accident initially. So it was circumstantial, the basis for the robbery, your evidence? Well, I think that there is no direct evidence in the sense that he didn't say, I'm going to plan to rob him. But yes, and afterwards there were pictures on his phone that indicated that he was reflashing and showing the marijuana and that he was profiting from this and that he wanted the marijuana and that he drove the whole deal. So it is circumstantial in that respect, your honor, but it was, I think, strong circumstantial evidence. He took the marijuana, which was $11,000 worth of marijuana. He kept the cash and he, you know, was selling it and acting like everything was okay until sort of forced to... So why isn't it significant that the translator, I think the only reference to the word robbery came from the translator and it wasn't apparently a direct English translation? Well I think that first, I want to start off by saying that I think that there was a waiver in this case, again, and that's partly because, as the court knows, the defense counsel had a very specific strategy. He said, and this is on supplemental excerpts of record 444, if there are any material differences in the interpretation or in the testimony of Turner, quote, I can ask Mr. Slew about what he meant in English, what was stated in the dialect. And in fact, he implemented this strategy because during the direct examination of Mr. Slew, you know, when you said, I did it, were you confessing? And Mr. Slew said, no, I was just saying that I was the one who had been accused of things. And then he specifically talked about this robbery language, that's at supplemental excerpts of record 626. And he said he was not describing a robbery incident, but, quote, the verbal aspect of what happened in the car between Muzak and Slim. So this, I think, constitutes a waiver. The defense counsel made an objection on the English to English translation, and then sort of sat back and said, I know I can make objections, but I'm not going to make objections because I have a specific strategy, and that strategy will be to clear anything up through Slew's testimony. He did that. So I think that's waiver. Assume it's not waiver. Assuming it's not waiver, it's not plain error. And it's not plain error because, as this court said, Well, but the other side is arguing that it's abuse of discretion because of the one objection that was made earlier regarding the fire something. The burning papers. The burning papers. Right. Well, I think that's just wrong because we don't have, he didn't make it as a running objection and it was not to specific pieces of evidence. That was as to a different piece of evidence. And I think it goes to the waiver argument because defense counsel knew that he could make objections and chose not to. But every defense counsel knows that he or she can make objections. But specifically on this ground and with this testimony. But it was not, it's a different ground. English to English objection is different from conjuring a robbery objection. Well I think, Is that right? I think that is right. I mean, I think there's a specific Two, they're completely different conceptually. They are different conceptually, but it's all, the basis was what's, where's the foundation for him making this because he's a linguist. That's the English to English, right? What the judge said is you can do English to English if you lay a foundation. There was nothing about importing the robbery concept into the translation of the interpretation at that point. So at the very most then though, I think what we have here is that if they're distinct objections, we have an issue of plain error. He didn't make the objection. And there's no plain error here because we are talking about translation and interpretation. And patois is a little bit different. We're not talking about, let's say, Japanese to English. Patois is kind of this dialect or what the translator called almost a broken English. Where you have English and the patois kind of filtering in and out of each other. Especially the way Mr. Slew was employing it in the conversation. And so you do have this kind of in and out. And part of this is to understand what Mr. Turner's translation was and to understand the methodology behind it, which this court has said is very important when you have expert testimony. It made sense to present to the jury what he thought he was listening to and how he interpreted that. And whether he thought they were talking about a robbery. He didn't say that the word is robbery or that he admitted to a robbery. His exact testimony was, it sounded to me like he was talking about or he was involved in a robbery. And what did that, what was the basis for that testimony? It certainly wasn't his knowledge of patois. Well, I think that there wasn't very much more than just sort of the language. Which is that the language, which is on excerpts of record 498 in which the court read earlier. Which is that he says, well, it went bad. Didn't want to give it. Fighting back. You know how it is. You know. Give me that. People feel brave. You feel you really aren't going to. You see what I'm saying? It was like really one of them type situations. Did he do one of your moves and get it? Is what the girlfriend says. And he says people are not smart like me and they don't move like me. So it is kind of based on that language and the jury, I think it was important for the jury. That's not a translation. Kind of saying what, well, what he was really saying that at that point was he committed a robbery. I think what Mr. Turner was saying was this is what it sounded to me like what they were talking about. Right. But that's not, that's not a translation. No, I think it's methodology. I think it's methodology testimony. I think it goes into, I, this is what I heard or what I thought they were talking about. Why did he need, why did he need, I don't even, I don't even understand how you get from point A to point C here. What does the fact that they were talking about a robbery? How does that bear on translating the words from patois to English? Well, I think that words, I mean, if you put words into Google translate without any context, you might get something that's gibberish. I mean, we know that language translation is a little bit of an art. It's not an exact science. So if you think that you are listening to people talking about a robbery, you might translate in a certain way. If you think you're talking about people talking about getting ready for a party, you would, you might translate and use different words to translate that. And so it was important to the jury or certainly not harmful to let the jury know what he thought he was listening to. And that might, you know, bleed into his bias and whether the jury should be crediting his translation. How would that translation have changed if at all had Turner not imposed the robbery overlay on it? I don't know specifically, but I can't. For the life of me, I can't figure out how the translation would have changed if Turner didn't think that there was a robbery going on. So what is it about this translation that required the methodology of superimposing a robbery construct on what they were talking about? Well, Your Honor, I'm not saying that it's required, but I'm saying that it was not objected to evidence and it wasn't particularly plainly, the error wasn't very plain because we know that we're allowed to have methodology evidence before the jury. And so it isn't something where, you know, the district court should have leapt, you know, up from her seat and said, this is clearly wrong because it's in the vein of methodology. It's saying, this is what I thought I was hearing. This is how I translated it and we didn't get into it any deeper than that. So the argument is that there's no plain error, but even if this court were to find that there was some plain error, this did not affect the defendant's substantial rights because you have, so the testimony is not actually very controversial. You do have his interpretation of them talking about a robbery, but you also have the words themselves, the jury looking at these words about the person feeling brave, that you don't think you're going to, you see what I'm saying. And then you have a thousand pages of other testimony and hundreds of other exhibits showing through text messages that you have Slew orchestrating this drug deal. You have cast reports showing the locations, making it impossible that Slew was correct when he said that Slim and he were driving in the car together. You have photographs of him gloating after the death of Muzak over the drugs. And you find the murder weapon, likely murder weapon, in his house. You find all of that. But none of that goes to the intent element of robbery. So what's the best evidence that you can point to that goes to that intent element of robbery? That he intended to rob? Yes. Well... As opposed to a drug deal gone bad. As opposed to a drug deal gone bad. Right. Or as opposed to this just happening during a drug deal, I guess.  Well, he, you have Muzak saying, don't kill me, essentially, no, wait. Then him killing him, pushing him out the car, and then taking the drugs, and then parceling them out as though nothing really bad happened until there was some concern on Boyd's part about whether Muzak, why Muzak wasn't responding to him. And then finally saying, okay, well, it went bad and I killed him. So you're saying that after the shooting, Slew should have stuck around and completed the transaction? And made sure that whoever's supposed to have the money has the money, whoever's supposed to have the marijuana has the marijuana? Or do you think it's more likely that when somebody gets shot during a drug deal, everybody scrams and doesn't really think about allocating the fruit, the monetary or the drug fruits of the transaction? I'm saying that he shouldn't have shot the victim at all. And that part of the reason he shot him, and I think the evidence bears this out, is that he wanted to get the drugs from him without giving over the money. And where's- Counsel. Judge Gould, if I could interject a question. If both my colleagues' questions have been answered, I just have two questions about the translation. Yes, sir. The issue concerning Patois to English, am I correct that the appellant was talking to his girlfriend when in the jail or prison in their own native language? Did they use a mixture of English and Patois in that discussion? Yes, there was a mixture of English and Patois. And if you look at, for example, excerpts of record 498, which is I think the key discussion that we've been talking about, the translation shows on one sort of column all the English. The other side would have the Patois, which is sometimes intermingled with English. So you might have a sentence that's half in English and half in Patois. So is there any evidence in the record about how often in immigrant communities people mix together their native tongue and English when they're speaking? I don't believe there was any evidence other than what Mr. Turner said from his own experience that sometimes his own mother would strategically choose to insert or say certain things in Patois in public. Thank you. And then my final question, and this can be answered briefly, probably is this. Assuming that the issue here on this testimony is an issue of plain error and not abuse of discretion, am I correct that our circuit's standard for plain error still requires not only first, an error, second, that it be plain, third, that it affects substantial rights, but that there's a fourth element, an addition that's either described as a fourth element of plain error or it's sometimes talked about as a discretionary factor for the court, namely that the admission of the unobjected testimony at this point would impair the fairness, integrity or reputation of the court? Absolutely, Your Honor. All four elements, and those are not met here in part, for example, because nobody really mentioned Turner in the closing argument. If you go through and look at the closing arguments, the government's closing argument never mentioned Turner's. But the government's closing argument did mention what Slew told Asia Lee at the jail. Well, and I want to clarify this, which is there was no objection and there continues not to be an objection to the actual transcript, which was admitted in trial. This is not a situation where you sometimes have a transcript that's just an aid or translation that's just an aid for the recording. In this case, both that exhibit, the recording itself, as well as the translation were admitted as jury exhibits. They were both given to the jury. The jury was allowed to take this transcript back and read it. It wasn't sort of like here, all you have to rely on is Turner. Right, but the government did rely on the discussion between Slew and Asia Lee in its closing argument, and Turner had testified that the discussion was about a robbery that had taken place, right? They relied on Slew's own words, and they also relied on all the other evidence here that supported that he had committed the murder. And ultimately, I think, which goes to sort of the fourth, especially the discretionary aspect of the plain error standard, this Court should have no concerns that the integrity or the fairness or reputation of the proceedings were impaired, even if there had been an error here. We have a mountain of evidence. This is the 16th out of 19 witnesses. We had, you know, like this is less, I mean, specifically the robbery issue was maybe a few pages of trial testimony. If you look at kind of the relative sort of guilt, ultimately, the question was, is Boyd's testimony, which is corroborated by the cell cast, the cell site records, all this evidence, is that right, or is Slew's version correct? There is a lot of evidence of Mr. Slew being guilty of, I mean, there's a lot of evidence to support Mr. Slew's guilt of participating in a drug transaction, of even killing the victim here. The main question is whether there's a lot of evidence or at least enough evidence under our standard of review of plain error to support that it was during or in the course of a robbery. And I take it that you charged robbery for a particular reason, I guess, to get to the murder charge. Is that right? To be able to show felony murder or to be able to show what? Because why charge robbery when you have a killing that occurred during the course of this drug trafficking? Well, I would say, first of all, that you don't have to do that to get to the murder. You have the murder sort of independently, and you also have the drug conspiracy. Then why did you do the robbery? Why the robbery? Because I think a robbery, I didn't make the charging decision, but I believe that the evidence supports that there was a robbery, which was that you have somebody who is setting up, and the text messages show this, he's driving the entire drug transaction. He's asking for them to meet. He's driving when they meet, where they meet, how Muzak is going to come up, walk up, not just ride up with the drugs. And then you have this two-person drug transaction, where then he then shoots the holder of the marijuana, takes off with the marijuana, takes off with the money, and then has all these pictures on his phone showcasing all the money, showcasing the drugs, showcasing himself in the car hours after the murder. And so we believe that, I think the evidence shows that, and I suspect that is why we charged it that way. So you could have gotten to murder a different way? I believe so, yes. But what would that have been? What route would that have been? That during, well, I mean, you have Pinkerton, for example, which is that during his conspiracy to distribute marijuana, that it was foreseeable to him, and part of the course of that, that somebody would bring a gun. And there's certainly a lot of precedent in this court to show that when you have large amounts of money and large drug deals, that that can be foreseeable, that somebody would bring a gun, and that that would go off and hurt somebody or kill somebody. That's one route for the 24J, 924J, not 24J. I do want to just quickly go back and say that on this sort of instructional issue, that if this court ever goes to the harmlessness issue, the fact that the jury found first-degree murder in this case, I think is dispositive for why it was any error would be harmless. They had the choice of finding second-degree murder, finding a lesser mens rea, they found premeditation, which is inconsistent with any manslaughter instruction. And that in this case, I think if you review the evidence, as I did in preparation for this trial, you'll find that there was a mountain of evidence in finding in favor of the guilt, and that under the properly instructed Pinkerton instructions and all of the evidence, that the jury's verdict should be upheld. Thank you, Your Honor. Let me see. Judge Gould, do you have any other questions for Ms. Chen? No, I have no further questions. I appreciate the excellent argument of counsel on both sides. Thank you, Your Honors. Yeah. So I'm going to give you a couple minutes here. That'll be absolutely fine. I'll be brief. Your questions were detailed, and the Court's obviously focused on the Harvey issues. I won't belabor anything. Short points. One, the government's incorrect. Sudden quarrel and heat of passion are different offenses, period. Just do some historical research. They're not even close to the same offense. The standard, and I disagree with their citation that Mr. DeMister waived this argument and withdrew it. He asked for the instructions. He did admit that it was not insufficient for heat of passion because Mr. DeMister, a state court practitioner, recognizes that heat of passion is, as what I learned recently, in flagrante delicto, which does not apply here. It is sudden quarrel. And so for voluntary manslaughter, that's intentional killing without malice, or a reckless act that is done with extreme regard for human life that is likely to result in death. That's voluntary manslaughter. And an involuntary is when you do a lawful act in an unlawful manner, typical unreasonable self-defense. You really overreact to what you're confronting with, but it's accidental. Related to that point, I disagree with my colleague Boyd's testimony, which we accept. We have to in this posture. And the government has sworn, to get them three years, that it was truthful, doesn't say there's a robbery, and he describes the event. So everything in this appeal, as we presented, stands on Boyd's testimony. We have to accept it. We must. We indulge it. We have to. But so does the government. And I don't want to say no robbery. He doesn't say it's an intentional shooting or an accidental shooting. And when they get to argue circumstantial evidence to suit their needs, why can't Mr. Slough? It's as likely it was accidental as it was intentional. And when there's no evidence either way, both sides can argue the facts. Tight quarters, quick confrontation. He said he should be all right. The government makes a big deal about somehow shooting in a torso. ER-481 shows the wound. He shot him in the shoulder. And I'm not saying that's a good idea. It's more than frowned upon. It means I passed. And that's a horrible thing. But it wasn't murder. And it fits within the manslaughter rubric. If he was trying to kill him, it was an intentional killing. He shoots him in the head or the chest, as even he recognized. Last, the government sort of notes and close and say, first-degree murder settles it. No, they almost give it away then. They say it's because of Pinkerton. And they admit it. They get the first-degree murder. If the jury found he was in a drug deal, and I think there was substantial evidence to and that Muzak died, and there's undeniable evidence to support that, that it was reason foreseeable he's guilty of first-degree murder without any finding of any criminal mens rea other than to deal drugs. That is an unlawful finding. That is insufficient as a matter of law. You can't be a murderer because you did a drug deal that left a body. It's not an inherently dangerous homicide. So I'll leave you with the points that I think are most important. Turner changed his case, and it's obvious how he changed it. And he changed it by making up words that don't appear anywhere. He translated this transcript without a problem, but he went beyond that in a way that has no justification. And the notion that slew is the driver of this deal can't be sustained. Boyd brought the buyer, he brought the seller, he brought the muscle queue, he brought the ride, he set it up. It went south, and it's a terrible tragedy that Mr. Muzak's not with us. But it's also a miscarriage of justice that the notion that slew was convicted of murder without the jury's ability to, one, not be infected by improper testimony, and two, continue the full spectrum of options, this Court in Arndt closes its opinion with a great discussion of why lesser-included instructions are so important, to ensure that juries get it right. Because all the parties, and we're all guilty of it as adversaries, we stake out our positions and we argue them strongly. And my colleague, Ms. Chan, has done a great job today. I've done my best. But the fact finders, decision makers, aren't bound by us and our ideas and what we say. And when those fact finders are jurors, the district judge has to make sure they have all the options to make sure they get the right outcome. They didn't in this case because they didn't have the ability. Thank you for your patience and your graciousness, Your Honors. Thank you both very much. There were excellent oral arguments here today. We appreciate your preparation. Thank you. We'll be in, well, we'll be adjourned. We're done for the week today. Thank you very much. Thank you. The case, I'm sorry, the case of United States v. Slew is now submitted.
judges: Gould, Murguia, Feinerman